CULPEPPER, Judge.
Plaintiff seeks workmen’s compensation benefits for total and permanent disability. Defendants are the employer and its insurer. From an adverse judgment, plaintiff appealed.
The issue is factual: Was plaintiff disabled beyond the date on which compensation payments were terminated?
The general facts show that plaintiff, a 36 year old Negro male, was working as a laborer at a cotton gin owned by the defendant, Plaucheville Gin Company. On the afternoon of September 11, 1967 he was assigned to clean a “lint cleaner”. This is a cylinder, approximately 40 inches in diameter, made of wire screen braced with angle iron which protruded about 1% inches into the inside. Plaintiff was inside the cylinder, cleaning lint from the screen, when someone inadvertently started the gin machinery. The cylinder began to turn at a speed estimated by the gin foreman to be 18 revolutions per minute. Plaintiff was tumbled about in the cleaner for a period which he estimated at 3 or 4 minutes before it was turned off. He blacked out for a few minutes, but on removal from the cleaner regained consciousness and his only apparent injuries were bruises. He remained at the gin, drove a truck to buy a beer and went home about 5:00 p. m.
The next day, September 12, 1967, plaintiff went to Dr. Leon F. Beridon, a general practitioner in Plaucheville. This physician *604 diagnosed multiple contusions of the chest, hack, arms, legs and a “low-back” strain. The treatment prescribed was drugs for pain. Dr. Beridon saw plaintiff several times in his office during the next 2 weeks. Plaintiff’s principal complaint was that he was stiff and sore and his feet swelled at night. On September 25, 1967, he discharged plaintiff. In his testimony at the trial, Dr. Beridon stated he discharged him “to attempt to work as well as he could” not knowing exactly the nature of his previous duties or what kind of work he could obtain. However, the written report which Dr. Beridon later sent to the employer stated that plaintiff was able to return to full duty.
The owners of the gin testified they paid plaintiff his full wages, in lieu of workmen’s compensation, for a period of 2% weeks after the accident, which means that compensation was paid through September 25, 1967, the date on which Dr. Beridon discharged plaintiff. The gin owners testified they thought plaintiff was going to return to his same job but he did not do so.
Mr. Milburn Ducote testified that plaintiff, with a crew of 3 men, went to work for him hauling hay from the field to a barn. Ducote paid plaintiff by check for this work as follows:
September 27, 1967 — $ 58.00
September 30, 1967 — $ 86.70
October 6, 1967 — $ 92.00
October 11, 1967 — $180.00
On cross-examination Ducote testified he did not actually see plaintiff loading or unloading hay from the truck but he did see plaintiff in sweaty clothing with straw on him and he appeared to have been performing manual labor. Mr. L. B. Coco, one of the owners of the gin, also testified he happened to be in Ducote’s office one day and saw him paying plaintiff, who was sweaty and covered with straw and appeared to have been working. In rebuttal, plaintiff admitted he had worked for Ducote but said he only drove his truck and hired others to load and unload the hay.
During the latter part of October, 1967, plaintiff worked about 3 weeks for Southern Builders Construction Company on a concrete job in Alexandria, Louisiana. His duties consisted of cutting piling with a power saw and finishing concrete with a trowel and a board. He testified he worked in pain. However, the job foreman, Mr. Murray, testified he secured plaintiff’s services through a union, and that plaintiff worked satisfactorily and made no complaints of pain or inability to do the job.
During November and December of 1967, and January, 1968, plaintiff worked intermittently, when weather would permit, for Mr. C. C. Gremillion, a logging and wood contractor in Simsport. Plaintiff operated a power saw which, the witnesses said, was hard manual labor. Plaintiff testified he had to quit this work because of pain in his left arm as would be expected from nonuse this, Mr. Gremillion testified he worked satisfactorily and made no complaint of pain while he worked. However, when Gre-million went to ask plaintiff to come back to work, he said he couldn’t because his arm was hurting.
On January 29, 1968, plaintiff returned to Dr. Beridon complaining for the first time of pain in his chest, neck and arm. This physician found no cause for the complaints and sent plaintiff to the Baptist Hospital in Alexandria for x-rays, which were negative.
On March 16, 1968, plaintiff started seeing Dr. Albert Abramson, a general practitioner of Marksville. Plaintiff complained of pain in his chest, left shoulder, neck and left arm. Dr. Abramson found no objective symptoms. He said there was no muscle spasm, all reflexes were normal and there was no atrophy of the muscles of the left arm as woud be expected from nonuse due to pain of the degree plaintiff described. Being unable to find any cause for plaintiff’s complaints, Dr. Abramson referred him to Dr. C. W. Lowrey, an orthopedic surgeon of Alexandria.
*605 Dr. Lowrey saw plaintiff on April 25, 1968. He found no muscle spasm, no atrophy, no loss of motion, and, generally; no objective symptoms to support plaintiff’s complaints. However, Dr. Lowrey did testify that plaintiff exaggerated his complaints and “masked” his condition to the extent that the doctor was unable to determine whether plaintiff actually had any loss of motion, tenderness or other symptoms.
Plaintiff returned to the care of Dr. Abramson and continued to see him intermittently through December of 1968. Dr. Abramson said that on these visits he could find no objective symptoms but, based on plaintiff’s subjective complaints, he prescribed drugs for pain and muscle relaxation.
Beginning in March of 1968, plaintiff worked for Mr. Reilly Bordelon, driving a farm tractor during the spring and summer and then operating a cotton picker during the fall. Mr. Bordelon was plaintiff’s own witness. He testified that although plaintiff operated the tractor and the cotton picker satisfactorily, he used his left arm very little. Contradicting this is the testimony of witnesses for the defendant who say that it takes two good strong arms to turn a cotton picker.
During the period of time he was working for Mr. Bordelon, plaintiff was seen by Dr. John Silver, a resident in surgery at Charity Hospital in Pineville. This physician also found no muscle spasm, no atrophy or other objective symptoms. Based on subjective complaints, he diagnosed a possible ruptured disc at the C5-C6 level, but he said plaintiff exaggerated and the diagnosis was questionable.
At the request of his attorney, plaintiff was seen on 4 occasions during September and October of 1968 by Dr. C. C. Laurent, Jr., a psychiatrist in Alexandria. Based generally on nervousness, depression, loss of sexual motivation and other such symptoms, this physician opined plaintiff was suffering from “psychoneurotic reaction, mixed, secondary to trauma.”
On Dec. 10, 1968, plaintiff was examined at the request of defendants, by Dr. Davidson H. Texada, Jr., a specialist in neurology and psychiatry of Alexandria, whose qualifications are much more impressive than those of Dr. Laurent. Dr. Texada’s neurological examination was negative except for “some sensory loss in the level of the distribution of the third and fourth cervical nerves” which was variable, not clear-cut and considered by the doctor to be of little significance. The psychiatric examination was negative for abnormality. He concluded plaintiff had no significant neurological or psychiatric abnormalities and that he could return to manual labor.
At the request of defendants, plaintiff was also examined by Dr. Daniel M. Kings-ley, an orthopedic surgeon of Alexandria. His examination was negative in all respects and he stated plaintiff could return to manual labor.
The court appointed as an expert Dr. Paul M. Davis, Jr., an orthopedic surgeon of Alexandria, who saw plaintiff on October 14, 1968. Plaintiff complained of pain in the left arm, neck and back of the head. He held his left arm to his side as if it was paralyzed. Plaintiff said any movement of the left arm produced pain. Dr. Davis’s report to the court reads as follows:
“DIAGNOSIS: Sprain, cervical spine, minimal.
“Examination of the patient, at the present time, fails to reveal any neurological deficit in either upper extremity. He apparently is using his left upper extremity fully or he would have atrophy of the shoulder muscles and of the left arm and forearm. Actual measurement of the left arm and forearm show no evidence of any atrophy. The patient possibly does have minimal pain in his neck, at the present time, as evident by the fact that he does have reversal of the lordotic curve. He does not have any fractures or any subluxation or dislocation of the cervical spine.
*606 “The patient is exaggerating his complaints without doubt, in his neck and left upper extremity. Possibly he does have some minimal pain in his neck but this could not be much or he would have more findings. No evidence of a ruptured cervical disc is found. The patient can, at the present time, perform work, but should not do any work which requires heavy lifting for the next month or two, after that he should be able to report back to full employment.”
Plaintiff makes a strong argument that we should at least award compensation for a period ending 2 months after the report by Dr. Davis. We have carefully considered this contention and decided that Dr. Davis’s report, as further explained in his deposition, is not sufficient to tip the scales in plaintiff’s favor.
In his deposition Dr. Davis was asked why he used the words “possible” and “minimal” in describing plaintiff’s neck pain. The doctor’s answer, as we understand it, was that plaintiff’s exaggeration of his history and his present pain was such that it was “extremely hard” to evaluate his actual condition. But, to give plaintiff the benefit of the doubt, he reported that plaintiff “possibly” still had “minimal” pain.
In another portion of his deposition Dr. Davis said this about plaintiff’s present pain:
“Q. Would you feel the pain from such an injury would be substantial pain after the first several months say?
“A. I think it could be substantial at times. I think that as long as he’s moving his neck as well as he is now I don’t think he’s having substantial pain now.”
We do not construe Dr. Davis’s testimony as a whole as expressing what can be termed an expert medical opinion that plaintiff was suffering substantial disabling pain.
We conclude, as did the trial judge, that plaintiff has failed to prove by a preponderance of the evidence he was disabled beyond September 25, 1967, the date on which Dr. Beridon discharged him. Although the lay evidence is somewhat in conflict as to the nature of the work which plaintiff performed after his discharge by Dr. Beridon, it is obvious the trial judge believed that plaintiff returned to hard manual labor which he has performed intermittently ever since without substantial pain. Furthermore, the medical testimony also preponderates in favor of defendants. We find no manifest error in the judgment complained of.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiff appellant.
Affirmed.